**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

v.

JERRY BROWN and GUY LIGHTFOOT,

Defendants.

---

12-CR-292A
**DECISION AND ORDER**

This case is before the Court on both Defendants' objections to Magistrate Judge Schroeder's Report and Recommendation (Docket No. 70), which recommends denying both Defendants' suppression motions. For the reasons stated below, the Court adopts the Report and Recommendation in its entirety. The Court therefore denies both Defendants' suppression motions.

## BACKGROUND

The Court adopts Magistrate Judge Schroeder's thorough factual findings. Defendant Lightfoot does not object to those findings. Defendant Brown, however, does object. He primarily argues that Niagara Falls Police Detective Palermo *threw* his radio at Brown's car, and that the radio did not, as Detective Palermo testified, accidentally fly from his hand and through Brown's car window. *See* Docket No. 83 at 9 n.2. Brown also objects to Magistrate Judge Schroeder's finding as to the exact time the police located Brown's gun. *Id.* at 12. Finally, Brown contests some of Magistrate Judge Schroeder's conclusions as to mixed questions of fact and law, such as whether the police had reasonable suspicion to stop and question Brown. *Id.* at 9 n.1.

"The Second Circuit has instructed that where a Magistrate Judge conducts an evidentiary hearing and makes credibility findings on disputed issues of fact, the district court will ordinarily accept those credibility findings." *United States v. Lawson*, 961 F. Supp. 2d 496, 499 (W.D.N.Y. 2013) (citing *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008)). The Court has reviewed the record in its entirety. After doing so, the Court finds that the record supports Magistrate Judge Schroeder's credibility findings (*see, e.g.*, Docket No. 70 at 16, 20, and 32), as well as his factual findings. The Court therefore adopts those findings.

In any event, Brown's objections to Magistrate Judge Schroeder's factual findings are immaterial to the Court's resolution of Brown's objections: as discussed below, the Court's decision to deny Brown's suppression motion does not turn on the factual findings to which Brown objects.

## DISCUSSION

Both Brown and Lightfoot object to several of Magistrate Judge Schroeder's recommendations. The Court reviews those recommendations *de novo*. *See* 28 U.S.C. § 636(b)(1).

### A. Brown's objections

Brown objects to three of Magistrate Judge Schroeder's findings and conclusions. First, Brown objects to Magistrate Judge Schroeder's conclusion that the police had reasonable suspicion to attempt to stop and question Brown while he was sitting in his car outside Lightfoot's house. Second, Brown objects to Magistrate Judge Schroeder's conclusion that Brown was not "seized" within the meaning of the Fourth Amendment until he was formally arrested. And third, Brown objects to Magistrate

Judge Schroeder's conclusion that Brown's post-arrest statements, as well as the post-arrest recovery of evidence from in and near Brown's car, was tainted by Brown's allegedly unlawful arrest.

**1. When Brown was seized and whether that seizure was justified under the Fourth Amendment**

Of Brown's three objections, the Court first addresses whether Brown was seized before he was formally arrested. The Court resolves this objection first for two reasons. First, the answer to that question informs the rest of the Court's Fourth Amendment analysis, because the time of Brown's Fourth Amendment "seizure" affects the validity of any post-seizure statements and searches, and it also establishes the point in time from which reasonable suspicion or probable cause is measured. *See Rios v. United States*, 364 U.S. 253, 262 (1960) (noting that the "validity of the search turns upon the narrow question of when the arrest occurred"). And second, because the Court holds, as discussed below, that Brown was not seized in front of Lightfoot's house, the Court need not resolve whether the police had reasonable suspicion to stop Brown at that location. It is well settled that "[t]he grounds for a stop must exist *at the time of the seizure*." *United States v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009) (emphasis added). Thus, if the officers did not seize Brown, it is irrelevant whether their *attempt* to seize him was reasonable. *See id.* ("The rule from *Hodari D.* is based on the 'settled requirement . . . that reasonable suspicion must arise *before* a search or seizure is *actually affected*.'") (quoting *United States v. Swindle*, 407 F.3d at 562, 568 (2d Cir. 2005)) (first emphasis in original, second emphasis added); *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) ("[W]e must first determine when exactly the police

seized [the defendant], in order to assess whether there was reasonable suspicion for the stop 'at its inception.'") (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

Brown was unquestionably seized at the time he was arrested. *See Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) ("Indisputably, an arrest is a seizure" under the Fourth Amendment.) Brown argues, however, that he was seized prior to his arrest. Specifically, Brown asserts that he was seized when Detective Palermo allegedly threw his radio at the driver's-side window of Brown's car as Brown was leaving 1953 Falls Street.

Detective Palermo *attempted* to seize Brown in front of 1953 Falls Street, but none of his actions at that location in fact seized Brown within the meaning of the Fourth Amendment. After pulling up behind Brown's car in an unmarked police car with its lights activated, and after identifying himself as a police officer, Detective Palermo verbally ordered Brown to stop. *See* Tr. 160:19-22; 161:8-10. Brown, however, did not obey Detective Palermo's order; rather, he began making an "extremely erratic" U-turn so that he could drive away from Detective Palermo. Tr. 161:16-17. Detective Palermo's show of authority was, therefore, not a seizure, because even if "[a] reasonable person standing in [Brown's] place would have felt bound to stop" by Detective Palermo's order and his flashing lights, that "objective requirement 'states a *necessary*, but not a *sufficient*, condition for seizure.'" *Baldwin*, 496 F.3d at 219 (quoting *Hodari D.*, 499 U.S. at 628) (emphases in original). Where a purported Fourth Amendment seizure is based on an officer's order to stop, a seizure has not occurred unless there is also "*submission* to the assertion of authority." *Hodari D.*, 499 U.S. at 626 (emphasis in original). Brown's decision to not submit to Detective Palermo's order,

even if a reasonable person would have done so, means that Detective Palermo's order did not seize Brown for purposes of the Fourth Amendment.

Brown argues, however, that Detective Palermo seized Brown when Detective Palermo allegedly threw his radio at the driver's-side window of Brown's car (thereby breaking the window) as Brown was making his U-turn. Magistrate Judge Schroeder found that Detective Palermo did not throw his radio at Brown's window but that, instead, the radio inadvertently flew from his hand as he was attempting to drive away from Brown's car. *See* Docket No. 70 at 20. Brown strongly disputes whether the record supports this finding, but the Court need not resolve the question. Because even if Detective Palermo *did* throw his radio through Brown's window, that act did not constitute a "seizure" within the meaning of the Fourth Amendment.

This is so for two reasons. First, Detective Palermo's alleged act of throwing his radio through Brown's window in an attempt to stop Brown would likely be a "show of authority." But, as discussed above, Brown did not submit to that show of authority; instead, he drove away. Thus, there was no seizure. Second, Detective Palermo's alleged act of throwing his radio might also be an "application of physical force"—and, therefore, a seizure—within the meaning of the Fourth Amendment. *Hodari D.*, 499 U.S. at 626. But on the facts of this case, that application of physical force does not appear to have been intended to restrain Brown's movement. "The word 'seizure' readily bears the meaning of," among other things "application of physical force *to restrain movement*, even when it is ultimately unsuccessful." *Id.* (emphasis added). Throwing a radio at Brown's window, even if Brown's window broke as a result, could not have been intended to "restrain [Brown's] movement." Detective Palermo could not

have thought that the radio, simply sitting inside Brown's car, was going to restrain Brown's movement. And it is too tenuous to suggest that Detective Palermo allegedly threw his radio at Brown's car in an effort to stop Brown by, for example, distracting him, momentarily shocking him into inaction, or injuring him. In other words, even assuming that Detective Palermo threw his radio at Brown's window, and assuming that that act was an "application of physical force," the record does not show that it was an "application of physical force to restrain movement." *Id.* In short, whether Detective Palermo's alleged act of throwing the radio through Brown's window was a seizure is a question the Court must answer based on "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Doing so in this case, the Court concludes that Detective Palermo did not seize Brown at any point during the events in front of 1953 Falls Street.

Having determined that Brown was not seized until he was formally arrested, the next question is whether the events following Detective Palermo's attempted stop provided sufficient justification for Brown's arrest. They did.

The Supreme Court's decision in *California v. Hodari D.*, 499 U.S. 621 (1991), "implicitly authorized a defendant's seizure based on events occurring *after* issuance of an . . . order to stop." *Swindle*, 407 F.3d at 568 (emphasis added). *See also Simmons*, 560 F.3d at 106 (noting that *Hodari D.* and *Swindle* both involved "a defendant who refused to comply by fleeing, police pursuit, and a 'seizure' occurring at the moment the defendant was physically restrained"). One such event is flight in response to a police order to stop. Of course, "[a]n individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business,

and his refusal to cooperate may not form the basis of his detention. 'But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not going about one's business; in fact, it is just the opposite.'" *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006) (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)) (some quotation marks omitted). Thus, "[f]light in response to an order to stop is relevant to the reasonableness of a stop because it precedes the seizure, which occurs when the fleeing suspect is physically apprehended." *Simmons*, 560 F.3d at 107.

Brown's flight following Detective Palermo's order to stop (whether or not that order was reasonable), and Brown's subsequent violation of several traffic laws, provided probable cause for Brown's eventual arrest. After Brown fled 1953 Falls Street, he began driving "at a higher rate of speed for normal residential vehicle traffic." Tr. 22:9-10. Special Agent Oswald testified that, in an effort to catch up to Brown, his vehicle "reached speeds of 50, 60 miles an hour," but that even at those speeds, he could not reach Brown, who had "made a series of turns." Tr. 22:11-13. Detective Palermo testified that the area through which Brown was driving had a speed limit of 30 miles per hour, that Brown was "driving erratic," and that while Detective Palermo could not "say [Brown] was speeding," he was driving "at a high rate of speed, considering the area." Tr. 163:5-23. Detective Palermo also testified that, after losing track of Brown's car, he and other officers eventually came upon Brown's car, which had its driver's door open and no driver inside. Tr. 164:17-20. In addition, Brown's wallet was lying outside the car (Tr. 164:21-165:6), and through the car's open door, Detective Palermo was able to see "loose ammunition on the driver's side floor," as well as "a rag on the driver's

side floor." Tr. 166:4-5. The rag, Detective Palermo testified, was, in his experience, "consistent with carrying a firearm." Tr. 167:6.

Once Detective Palermo and the other officers "observed a traffic offense—however minor—[they] ha[d] probable cause to stop" Brown. *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) (quotation marks omitted). For purposes of the Fourth Amendment, the officers were also permitted to arrest Brown, even though "traffic arrests [are] not necessarily part of their usual duties" *(id.)*, and even if they or other officers might not ordinarily arrest a person for the traffic offenses Brown allegedly committed. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 353-54 (2001) (in case involving "foolish" arrest for failure to wear a seatbelt, concluding that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender").[1] That is, even though Detective Palermo and the other officers were investigating suspected drug trafficking, they were within their right to arrest Brown for unrelated conduct—speeding and erratic driving—after they "directly observed [him] violating the traffic laws and thus had probable cause to arrest him." *Scopo*, 19 F.3d at 782. *See also Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's actions does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.") (quotation marks omitted). It is also irrelevant that, as Brown notes (Docket No. 83 at 16), he was

[1] Although not relevant to the Court's Fourth Amendment analysis, Brown's arrest was also authorized under New York law. *See* N.Y. Crim. Proc. Law § 140.10(1)(a) ("[A] police officer may arrest a person for . . . [a]ny offense when he or she has reasonable cause to believe that such person has committed such offense in his or her presence."); N.Y. Veh. & Traf. Law § 155 ("For purposes of arrest without a warrant, pursuant to [N.Y. Crim. Proc. Law § 140], a traffic infraction shall be deemed an offense.")

ultimately never charged with any traffic offense. *See Devenpeck v. Alford*, 543 U.S. 146, 148 (2004) (rejecting a rule that the Fourth Amendment is violated "when the criminal offense for which there is probable cause to arrest is not 'closely related' to the offense stated by the arresting officer at the time of arrest"). Finally, it is also irrelevant—at least for Fourth Amendment purposes—that Brown was held for several hours following his arrest, and that he was not immediately taken before a judge or, instead, given a ticket and released. *See Cnty. Of Riverside v. McLaughlin*, 500 U.S. 44, 55 (1991) ("[T]he Fourth Amendment permits a reasonable postponement of a probable cause determination while the police cope with the everyday problems of processing suspects through an overly burdened criminal justice system."); *Bryant*, 404 F.3d at 138 ("[T]he issuance of a[n] [appearance ticket] for the release of the arrestee immediately upon completion of postarrest administrative procedures is not constitutionally required. New York's discretionary scheme with respect to the issuance of appearance tickets is well within the range of flexibility allowed to the states with respect to their postarrest procedures.")[2] Thus, nothing about Brown's arrest or his subsequent interrogation violated the Fourth Amendment.

---

[2] As Magistrate Judge Schroeder noted (Docket No. 70 at 34-35), a delay in Brown's initial appearance might impact the admissibility of his statements under 18 U.S.C. § 3501(c). But, as Magistrate Judge Schroeder also concluded, Brown made his statement within § 3501(c)'s six-hour safe harbor. *Id.* at 35. Because neither party raises the issue, the Court assumes that § 3501(c) is applicable in this case, even though Brown was initially arrested on state charges. *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 359-60 (1994) (holding that § 3501(c) is not implicated where a defendant is first arrested on state charges and is later arrested on federal charges, but noting that case may be different if "state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment")

**2. Whether Brown's post-arrest statement and the post-arrest search of his car were valid**

Brown's final objection concerns the post-arrest recovery of a gun from near his car, as well as a search of that car. The Court addresses each in turn.

First, as Magistrate Judge Schroeder found, the police recovered a handgun inside a holster on the roof of a building near Brown's abandoned car. Magistrate Judge Schroeder found that the gun was recovered *before* Brown gave a statement concerning the gun. Brown suggests that this finding was incorrect. But even if it was, Magistrate Judge Schroeder found in the alternative that, if the gun was recovered *after* Brown gave a statement, nothing in the record suggests that Brown was not properly advised of, and that he did not thereafter waive, his *Miranda* rights. *See* Docket No. 70 at 32-33. Brown does not object to this alternate conclusion. Rather, he argues only that his statements "were taken by exploitation of the initial illegalities" and that his statements "were not sufficiently distinguishable to be purged from the primary taint." Docket No. 83 at 16. As noted above, however, Brown's arrest did not violate the Fourth Amendment. Thus, there was no taint to purge, and his post-arrest statements were therefore lawfully acquired.

Second, Brown objects to Magistrate Judge Schroeder's conclusion that there was sufficient justification for the search warrant Detective Palermo and Detective Galie obtained to search Brown's car after Brown was arrested. Detective Palermo testified that after coming upon Brown's abandoned car, he looked through the car's open driver's door (but never entered the car) and saw "loose ammunition on the driver's side floor" as well as a "rag on the driver's side floor." Tr. 165:20-166:5. Detective Palermo testified that, in his experience, the rag was "consistent with people carrying firearms."

Tr. 166:10. Detective Palermo still did not enter Brown's car; rather, he closed the car's door and stayed with the vehicle until it was towed away. Tr. 167:9–169:2. The following day, Detectives Palermo and Galie obtained a search warrant to search Brown's car. Tr. 169:16-170:18. Detective Galie's affidavit in support of the search warrant stated, in relevant part, that "Detective Palermo approached [Brown's] vehicle and observed in plain view suspected heroin and six rounds of pistol ammunition." Docket No. 61-1 at 3. Detective Palermo did not conduct the search himself, but the search recovered the loose ammunition and, Detective Palermo "believe[d]," "a small amount of narcotics . . . in the center console of the vehicle." Tr. 171:6-14.

Brown makes two arguments to challenge the warrant authorizing a search of his car. Brown first argues that Detective Galie made an intentionally or recklessly false statement in support of the search warrant when he stated that Detective Palermo had seen "suspected heroin" in plain view while looking into Brown's car. Docket No. 83 at 16. Thus, Brown argues, he is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Magistrate Judge Schroeder noted, however, that neither the Government nor Brown asked Detective Palermo during the suppression hearing "about seeing or not seeing drugs" in Brown's car prior to Detective Galie signing the search warrant application.[3] Docket No. 70 at 28. Thus, Magistrate Judge Schroeder concluded that Brown's assertion that he was entitled to a *Franks* hearing was based on "nothing more than mere speculation." *Id.* The Court agrees with Magistrate Judge Schroeder that Brown has not made, as he must to warrant a *Franks* hearing, a

[3] Brown argues that, in denying his *Franks* motion on this basis, Magistrate Judge Schroeder impermissibly shifted the burden from the Government to Brown. *See* Docket No. 98 at 5. However, this argument ignores that it is the *defendant's* burden to show that he is entitled to a *Franks* hearing. *See Franks*, 438 U.S. at 171 ("To mandate an evidentiary hearing, *the challenger's* attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.") (emphasis added).

"substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by [Detective Galie] in the warrant affidavit." *Franks*, 438 U.S. at 155-56.

Brown next argues that the warrant to search his car was not supported by probable cause, as "the mere possession of ammunition was no evidence of a crime." Docket No. 83 at 16. Thus, Brown argues, "the warrant was based singularly on . . . Det[ective] Palermo's alleged observation of a controlled substance inside the vehicle." *Id*. This argument, however, is factually incorrect. Detective Galie's affidavit is based not only on Detective Palermo's observation of ammunition, but it was also based on Brown's admission that he had possessed narcotics and firearms, as well as the officers' recovery of a gun from the roof of a building near Brown's car. *See* Docket No. 61-1 at 3. These facts, taken together, were sufficient to establish probable cause to search Brown's car for what the warrant sought to recover: drugs, weapons, and various types of paraphernalia related to drugs and drug distribution. Docket No. 61-1 at 1. This is true even if, as Brown argues, mere possession of ammunition is not illegal under New York law. *Cf. United States v. Gamble*, 388 F.3d 74, 77 (2d Cir. 2014) (finding that the plain view exception to the warrant requirement allowed officers to seize an ammunition clip found during a search for drugs because "the officers had probable cause to believe that the ammunition was connected with criminal activity because ammunition is a recognized tool of the drug-dealing trade"). In short, Brown points to no deficiencies in the warrant authorizing a search of his car.

For the reasons stated above, the Court overrules Brown's objections to Magistrate Judge Schroeder's Report and Recommendation. The Court therefore

adopts the Report and Recommendation in its entirety as to Brown and denies Brown's motion to suppress. *See* Docket No. 23.

**B. Lightfoot's objections**

Defendant Lightfoot objects to Magistrate Judge Schroeder's recommendation that the Court deny Lightfoot's motion to suppress. Specifically, Lightfoot argues that the warrant authorizing a search of his home was not supported by probable cause. That warrant was issued by a Niagara Falls City Court Judge after hearing the *in camera* testimony of a confidential informant. The informant did not himself purchase narcotics from Lightfoot. Rather, the informant testified that he purchased heroin from Lightfoot "through a third party of a mutual friend." Docket No. 107 at 21. The informant further testified that he waited outside while the third party went into Lightfoot's house; that the third-party did not have narcotics at the time he went to Lightfoot's house; and that the third-party had heroin when he returned to the informant's car. *Id.* at 23-26. Lightfoot argues that, because of this unusual source of confidential information, the warrant was not supported by probable cause. Lightfoot further argues that the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), does not apply.

The Court need not answer the question whether the search warrant was supported by probable cause because, even if it was not, the officers were not "sufficiently culpable" in relying on the search warrant "that . . . deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 139-40 (2009). In other words, even if the search warrant was invalid, the exclusionary rule does not apply in this case.

"When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on a subsequently invalidated search warrant." *Herring*, 555 U.S. at 142 (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 922 (1984)). The question in this case, then, is whether the officers' reliance on the warrant was objectively unreasonable. Although the Court decides this matter based solely on the good faith exception, the Court briefly discusses the law governing probable cause based on informant tips, as these "observations bear[] on the reasonableness of the agents' actions." *United States v. Ganias*, 824 F.3d 199, 209 (2d Cir. 2016). It is well-settled that "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When an issuing judge bases his or her probable cause determination on testimony from a confidential informant, the informant's "veracity, reliability, and basis of knowledge are all highly relevant in determining the value of his report." *Id.* at 230. And, as a result, all three factors "may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Id.* (quotation marks omitted). None of these factors is to be viewed in isolation; rather, as *Illinois v. Gates* made clear, "[i]nformant's tips . . . come in many shapes and sizes from many different types of persons." *Id.* at 232. Thus, a weakness in one indicia of informant-based probable cause can be overcome by strengths in other indicia of informant-based

probable cause. *See id.* at 233 ("If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip.")

In this case, the basis of the confidential informant's knowledge—his reliance on an unidentified third-party's alleged purchase from Lightfoot—is not particularly strong, but this weakness is offset by the fact that the informant's reliability and veracity were both well-established. The issuing judge established the informant's reliability at the beginning of the hearing. Further, the informant testified in person and under oath, thus "provid[ing] powerful indicia of veracity and reliability. *United States v. Elliott*, 893 F.2d 220, 223 (9th Cir. 1990). There is therefore "enough in the [hearing transcript] to cause [the Court] to readily conclude that the officers who executed the warrant acted in good faith." *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1234 (10th Cir. 2009) (holding that the good faith exception applied where "the affidavit . . . does not describe the basis of the informant's knowledge and police did not corroborate any details suggesting a gun would be found in the premises to be searched," but where the "affidavit does note that the informant had provided accurate information in the past and was 'not working off criminal charges or other charges'").

Nothing in the record suggests that the officers acted, as they must for the exclusionary rule to apply, "deliberate[ly], reckless[ly], or grossly negligent[ly]." *Herring*, 555 U.S. at 144. An officer might do so when he or she relies on an affidavit that "is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (quotation marks omitted). *See also United*

*States v. Carpenter*, 341 F.3d 666, 670 (8th Cir. 2003) ("'Entirely unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words.") In that case, the officer's "conduct [is] sufficiently deliberate that exclusion can meaningfully deter it," and it may be "sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. However, given that *Illinois v. Gates* "permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip," *Gates*, 462 U.S. at 234, exclusion would likely be appropriate only where something about the issuing judge's informant-based probable cause finding was so obviously problematic that a "'reasonably well trained officer would have known that the search was illegal' in light of 'all the circumstances.'" *Herring*, 555 U.S. at 145 (quoting *Leon*, 468 U.S. at 922 n.23).

Though the confidential informant's basis of knowledge in this case was not especially strong, nothing suggests that it would have been "entirely unreasonable," *Leon*, 468 U.S. at 923, for the officers to rely on the issuing judge's conclusion that the informant's testimony provided probable cause. To the contrary, Special Agent Oswald testified that he had received reliable information from the informant for several years (Docket No. 107 at 3) and that, during that time, he had never known the informant to be non-reliable. *Id.* The informant then identified a picture of Lightfoot's house as the one from which he had seen the third-party purchase heroin; he testified that he saw Lightfoot (whom the informant had met previously) greet the third-party at the door of the house; he testified that the third-party did not have narcotics at the time he went to

Lightfoot's house; and he testified that the third-party had heroin when he returned to the informant's car. *Id.* at 23-26. Further, the informant testified that, after he and the third-party left Lightfoot's house, Lightfoot called the third-party on the informant's phone to ensure that they had not been pulled over. *Id.* at 26-27. The officers then testified that, after the informant dropped off the third-party, he met with the officers, who field tested the substance the third-party had purchased. *Id.* at 27. The substance tested positive for heroin. *Id.*

The Court does not suggest that the practice of using a confidential informant's unknown friend is an ideal way of establishing probable cause—far from it. But, assuming for the sake of argument that the warrant was invalid, all of these facts, taken together, do not make the officers' reliance on the issuing judge's probable cause finding "deliberate, reckless, or grossly negligent," such that exclusion would be a "meaningful[] deter[rent]." *Herring*, 555 U.S. at 144. Indeed, the issuing judge inquired into the relationship between Lightfoot, the informant, and the third-party. Docket No. 107 at 21. The issuing judge also confirmed that the confidential informant did not search the third-party for drugs before the third-party entered Lightfoot's house. *Id.* at 24. The issuing judge, in other words, was clearly aware of the limits on the information presented to him. And, as a result, the officers could not be faulted, after listening to the issuing judge's questioning of the informant, for reasonably relying on the judge's finding that the informant's testimony provided probable cause. *See Leon*, 468 U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination.")

The Court therefore overrules Lightfoot's objection to Magistrate Judge Schroeder's recommendation to deny Lightfoot's motion to suppress. Magistrate Judge Schroeder made several other recommendations concerning Lightfoot's suppression motion, none of which Lightfoot objects to. The Court therefore reviews those recommendations for clear error. *See Mineweaser v. City of N. Townawanda*, 14-CV-144-RJA-JJM, 2016 WL 3279574, at *2 (W.D.N.Y. June 15, 2016). After careful review of the record, the Court finds none. The Court therefore adopts Magistrate Judge Schroeder's Report and Recommendation in its entirety as to Lightfoot. Thus, the Court denies Lightfoot's suppression motions. *See* Docket Nos. 23 and 38.

**CONCLUSION**

For the reasons stated above, the Court overrules both Brown and Lightfoot's objections. The Court therefore denies both Defendants' suppression motions. Docket Nos. 17, 23, and 38. The parties shall appear on September 7, 2016 at 9:00 a.m. to set a trial date.

**SO ORDERED.**

Dated: September 6, 2016
Buffalo, New York

*s/Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE